## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COREGIS INSURANCE COMPANY,** | : |
| | : |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | :    **Civil Action No. 1:03-CV-920** |
| **CITY OF HARRISBURG, et al.,** | : |
| | : |
| **Defendants and Third-Party** | :    **(Judge Kane)** |
| **Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **ST. PAUL FIRE AND MARINE** | : |
| **INSURANCE COMPANY, et al.,** | : |
| | : |
| **Third-Party Defendants** | : |

### MEMORANDUM AND ORDER

Pending before the Court is a motion for summary judgment filed by Coregis Insurance

Company ("Coregis").  (Doc. No. 145.)  By the motion, Coregis seeks entry of an order declaring that

the insurance company is not obligated to defend or indemnify Dauphin County under a claims-made

public officials liability insurance policy in effect from June 15, 2002 to June 15, 2003 with respect to

the underlying civil rights action of <u>Steven D. Crawford v. Commonwealth of Pennsylvania, et al.</u>, Civil

Action No. 1:CV-03-693 ("<u>Crawford</u>").[1]  The issues have been fully briefed, and the motion is ripe for

---

[1]    As discussed more fully below, Steven D. Crawford commenced the underlying civil rights action following his 2003 release from prison after having been incarcerated for 28 years for the murder of John Eddie Mitchell.  Crawford was released after his attorney discovered certain potentially exculpatory evidence that had allegedly been suppressed by law enforcement officers involved in Crawford's prosecution and trial.  Crawford also alleges that these officers altered evidence and testified falsely during each of Crawford's three trials held in 1974, 1977, and 1978.

disposition.  For the reasons that follow, the motion will be denied.

## I.   **BACKGROUND**

### A.   **The Insurance Policy**

On April 15, 2002, John D. Payne, Chairman of the Dauphin County Commissioners, signed an application to obtain public officials insurance coverage from Coregis.  (Doc. No. 145, Ex. B., Proposal for Public Officials and Employment Insurance.)  In this application, Payne indicated that no claims had been made, or were pending, against Dauphin County or any of its officials or employees.  (Id.)  Payne further represented that no Dauphin County official or employee had any knowledge of any fact, circumstance, or situation that might reasonably be expected to give rise to a claim against them or Dauphin.  (Id.)

Subsequently, Coregis issued Dauphin a Public Officials Liability Policy (No. POD-002329) effective from June 15, 2002 to June 15, 2003 ("POL Policy") (Doc. No. 145 Ex. B.)  Dauphin paid a premium in the amount of $118,203 for the POL Policy.  (Id.)  The POL Policy provides the following coverage, subject to certain applicable exclusions and exceptions:

> The Company will pay on behalf of the Insureds Loss as a result of civil Claims made against the Insureds by reason of a Wrongful Act, provided that Claim is first made during the Policy Period and written report of said Claim is received by the Company during the Policy Period or within sixty (60) days thereafter.

(Id.)  The POL Policy defines a "Wrongful Act" as "any act, error or omission of an Insured constituting a breach of a duty imposed by law or a breach of an Employment Contract."  (Id.)

The POL Policy provides, inter alia, the following exclusions:

> This Policy does not apply to the following, regardless of the cause of

2

action or theory alleged:

. . .

B.      any Claim or Loss Arising Out of any criminal, dishonest, malicious,
        fraudulent or knowingly wrongful act or omission.

. . .

D.      any Claim or Loss Arising Out of death, bodily injury, sickness,
        disease, disability, shock, humiliation, embarrassment, mental
        injury, mental anguish, emotional distress, or injury to personal
        or business reputation or character.

. . .

F.      any Claim or Loss Arising Out of assault, battery, false arrest,
        detention, imprisonment, malicious prosecution or abuse of process.

In addition to the foregoing exclusions, the POL Policy Prior Claims and Potential Claims

Endorsement provides:

        This Policy does not apply to any Claims or Loss arising out of any
        matter that was listed, or should have been listed, in the application(s)
        attached to this Policy.

(Id.)


        **B.      The Underlying Litigation and Dauphin County's Claim for Insurance**

        On March 28, 2003, Crawford commenced the underlying action by filing a complaint against

Dauphin County, the City of Harrisburg, and a number of individual defendants for alleged violations of

42 U.S.C. §§ 1983, 1985 and 1986, fraud, false imprisonment, conspiracy, and intentional infliction of

emotional distress relating to his arrest, conviction and imprisonment

3

for murder.[2]   The factual allegations set forth in the <u>Crawford</u> complaint are discussed in some detail below.

On February 14, 1974, Crawford was arrested and charged with the 1970 murder of John Eddie Mitchell.  (<u>Crawford</u> Complaint ¶ 9.)  Crawford was tried and found guilty on September 18, 1974.  (<u>Id.</u> ¶ 19.)  On October 8, 1976, the Supreme Court of Pennsylvania ordered a new trial.  (<u>Id.</u> ¶ 20.)  On February 24, 1977, Crawford was again tried and found guilty a second time.  (<u>Id.</u> 21.)  The trial judge subsequently declared a mistrial and overturned Crawford's conviction.  (<u>Id.</u> ¶ 22.)  Following a third trial for Mitchell's murder, Crawford was again found guilty on February 17, 1978.  (<u>Id.</u> ¶ 24.)  On May 14, 1982, Crawford was sentenced to a term of life imprisonment.  (<u>Id.</u> ¶ 25.)

Following his sentencing, Crawford engaged in a series of unsuccessful attempts in state and federal court to obtain post-conviction relief, including appeals of his conviction, petitions under the Post Conviction Relief Act, and requests for habeas relief.  (<u>Id.</u> ¶¶ 26-34, 49, 71-75.)  Subsequently, on September 29, 2000, Crawford filed another habeas petition, which was amended on November 29, 2000.  (<u>Id.</u> ¶ 34.)  By order dated March 13, 2001, the Office of the Federal Public Defender was appointed to represent Crawford in connection with this petition.  (<u>Id.</u> ¶ 49.)  Following this appointment, Crawford's counsel and the Dauphin County District Attorney engaged in a process of voluntary discovery.  (<u>Id.</u> ¶ 50.)  Following the fortuitous discovery of exculpatory evidence, the

---

[2]        The Court subsequently dismissed, <u>inter</u> <u>alia</u>, Crawford's state law claims and his claims for punitive damages brought in Counts III through VI of the underlying complaint against Harrisburg and Dauphin County.  (<u>Crawford</u> Doc. No. 38.)  The only claims remaining against Harrisburg and Dauphin County are alleged constitutional deprivations under 42 U.S.C. §§ 1983, 1985, and 1986 (Counts I and II).  (<u>Id.</u>)

District Attorney filed an application for permission to enter a nolle prosequi on or about July 16, 2002, and Crawford was released from prison.  (Id. ¶¶ 77, 79.)  Thereafter, on March 28, 2003, Crawford commenced the underlying action.

Crawford's complaint concerns the alleged actions of three law enforcement officers involved in Crawford's prosecution and conviction for Mitchell's murder.  Crawford alleges that he was convicted as a result of falsified laboratory notes and the issuance of a report based upon such notes, false testimony offered at trial based upon the altered notes and report, and the suppression of the original lab notes.  (Id. ¶¶ 36-48, 55-66, 76, 78, 84-86, 88, 94-95, 97, 102-103, 111-112, 117.)

Crawford alleges that in 1972, Janice Roadcap, a chemist with the Pennsylvania State Police, conducted an experiment on a palm print lifted from Crawford's father's automobile to determine whether certain foreign material found in the palm print was human blood.  (Id. ¶ 40.)  Roadcap viewed the results of this experiment with Sergeant Walton B. Simpson and Corporal John Balshy.[3]  (Id.)  Roadcap and Balshy each signed the lab notes, and all three law enforcement officials observed the testing.  (Id. ¶¶ 40, 42-43.)

Roadcap's notes taken during this time indicate that the experiment disclosed the presence of blood along the ridges of the recovered fingerprint, as well as in the valleys of the palmprint.  (Id. ¶ 41.)  This evidence would have allegedly supported an argument advanced by Crawford during his criminal trials that his print was already on his father's car at the time it came into contact with Mitchell's blood.

---

[3]      Crawford alleges that Balshy was a Corporal with the Pennsylvania State Police. Crawford further alleges that the late Walton D. Simpson was, at all times relevant to the underlying complaint, either a Sergeant with the Harrisburg Police Department or a Detective with Dauphin County.  (Crawford Complaint ¶¶ 6, 7.)

(<u>Id.</u> ¶ 56.)  Notwithstanding the result of the experiment, Crawford alleges that the law enforcement officials altered the original lab notes by deleting any reference to blood being found in the valleys of the palm print.  (<u>Id.</u> ¶ 44.)  This deletion was allegedly intentionally executed "to materially alter the record and conceal information which was exculpatory to Mr. Crawford."  (<u>Id.</u> ¶ 45.)  On November 30, 1972, Roadcap prepared a report containing the following statement: "[The test results] indicates the presence of blood deposited by the donor of the palmprint."  (<u>Id.</u> ¶ 46.)  By this statement, Roadcap indicated that the blood was located on Crawford's hand before he touched his father's automobile, apparently contradicting the results reported in Roadcap's lab notes.  (<u>Id.</u>)  Accordingly, Crawford alleges that the testimony Roadcap, Simpson and Balshy gave in connection with his criminal trials was "patently false and known by them to be false."  (<u>Id.</u> ¶ 47.)  Crawford alleges that these law enforcement officers gave false testimony at each of his trials in 1974, 1977, and 1978.  (<u>Id.</u> ¶¶ 17, 36-40, 47, 58, 78, 86, 95, 103, 112.)  Moreover, Crawford alleges that these law enforcement officers, and others, suppressed the original notes from Crawford's defense counsel at those trials.  (<u>Id.</u> ¶¶ 48, 57-65, 84, 88, 94, 97, 102, 117.)

   In the Complaint, Crawford alleges constitutional violations caused by the alleged falsification of Roadcap's original lab notes and the issuance of a report based upon such altered notes, false testimony based on the altered notes and report, and the concealment of the original lab notes, all of which allegedly resulted in Crawford's convictions and imprisonment for 28 years.  (<u>Id.</u> ¶¶ 84, 86.)  Crawford further alleges that law enforcement officials "offered knowingly false testimony at [Crawford's] three trials" with the "specific intent of wrongfully convicting" him.  (<u>Id.</u> ¶ 86.)  Moreover, Crawford alleges that this "fraudulent and deceitful conduct" is part of "a persistent and troubling

pattern of manipulating and falsifying evidence that exists and is condoned with the law enforcement

units" of Harrisburg, as well as those of the Commonwealth and Dauphin County.  (Id. ¶ 87.)

Crawford alleges that Harrisburg and Dauphin failed to train their employees sufficiently and lacked

adequate safeguards to prevent their agents from altering evidence, concealing exculpatory evidence,

and testifying falsely; lacked sufficient supervision, and fostered an environment that encouraged

employees to conceal evidence, alter evidence, and testify falsely.  (Id. ¶¶ 67-69.)

On April 2, 2003, Dauphin notified Coregis about the Crawford litigation.  On May 21, 2003,

Coregis agreed to provide Dauphin with a defense, subject to a reservation of rights.  (Doc. No. 147 at

¶ 45.)  On June 2, 2003, Coregis initiated the instant action, seeking a declaratory judgment that it was

not obligated to defend or indemnify, inter alia, Dauphin and the Estate of Walton Simpson, under the

POL Policy.

## II.   STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.

A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a

sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-

moving party.  Id. at 249.  The nonmoving party receives the benefit of all reasonable inferences.

Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of

the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the

complaint.  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Summary judgment

should be granted where a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden at trial."  Id. at 322.

## III.    DISCUSSION

This action is governed by Pennsylvania insurance law.  See W. World Ins. Co. v. Reliance Ins.

Co., 892 F. Supp. 659, 662 & n.6 (M.D. Pa. 1995) (analyzing choice of law issues in a coverage

dispute).  Under Pennsylvania law, an insurance company is obligated to defend an insured

whenever the complaint filed by the injured party may potentially come within the policy's

coverage.  Pacific Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985) (citing Gedeon v. State

Farm Mut. Auto. Ins. Co.,188 A.2d 320, 321-22 (Pa. 1963)).   "The obligation to defend is

determined solely by the allegations of the complaint in the action."   Pacific Indem. Co., 766 F.2d

at 760 (citing Wilson v. Md. Cas. Co., 105 A.2d 304 (Pa. 1954)).   The duty cannot be disclaimed

"until the insurer can confine the claim to a recovery that is not within the scope of the policy."  Id.

(citing Cadwallader v. New Amsterdam Cas. Co., 152 A2d 484 (Pa. 1959)).

To determine whether an insurer has a duty to defend an insured, a court must determine

the scope of coverage in the insurance policy itself and then ascertain whether the complaint

against the insured states a claim that is potentially covered under the policy.  Britamco

Underwriters, Inc. v. Weiner, 636 A.2d 649, 651 (Pa. Super. Ct. 1994).  If there is no possibility

that any of the underlying claims could be covered by the policy, then judgment in the insurer's

favor is appropriate.  See, e.g., Britamco Underwriters, Inc. v. Stokes, 881 F. Supp. 196, 198 (E.D. Pa. 1995); Germantown Ins. Co. v. Martin, 595 A.2d 1172 (Pa. Super. Ct. 1991).

Under Pennsylvania law, when a court interprets an insurance policy, (1) the terms of the insurance policy must be given their ordinary meaning; (2) a term is ambiguous only if reasonably intelligent people considering the term in the context of the entire policy would honestly differ as to its meaning; and (3) the parties' intent must be determined not only from the language but from all of the circumstances.  Medical Protective Co. v. Watkins, 198 F.3d 100, 103-04 (3d Cir. 1999). Any ambiguities are to be resolved in favor of the insured, however, a "court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." Northbrook Ins. Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir. 1982).  If unambiguous, the clear terms of the insurance policy as written should be construed according to their plain and ordinary meaning and given full effect.  Id.; Hartford Mut. Ins. Co. v. Moorhead, 578 A.2d 492, 495 (Pa. Super. Ct. 1990).

Exclusions from coverage of an insurance policy will be effective against an insured if they are "clearly worded" and "conspicuously displayed" without regard to whether the insured read the limitations or understood their significance.  Pacific Indem. Co., 766 F.2d at 761 (citing Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 567 (Pa. 1983).  Any doubts regarding the insurer's duty to defend must be resolved in favor of the insured.  Am. Contract Bridge League v. Nationwide Mut. Fire Ins., 752 F.2d 71, 76 (3d Cir. 1985).

Coregis makes several arguments in support of its position that it is not obligated to defend or indemnify Dauphin and Simpson under the POL Policy.  First, Coregis argues that Dauphin has admitted on numerous occasions that it had notice of Crawford's claims in March 2002, and therefore

coverage is barred because the claim was made against Dauphin prior to the inception of the POL

Policy.  Second, Coregis argues that coverage for the Crawford complaint is barred by the POL

Policy's prior knowledge limitation.  Third, Coregis contends that coverage is barred by Exclusions B,

D, and F of the POL Policy.   The Court will address these arguments in seriatim.

### A.   The Crawford claim was first made against Dauphin County during the June 15, 2002 to June 15, 2003 policy period.

Coregis points to certain admissions that Dauphin County made in its answers to interrogatories

and requests for admissions to support its claim that the county knew of Crawford's claims on March

31, 2002, and that a claim was made against the county on March 31, 2002.  For its part, Dauphin

vigorously denies that a claim was made prior to the policy period, and contends that its responses to

Coregis's discovery requests contained typographical errors that were subsequently amended.

Dauphin has provided the First Affidavit of Garry Esworthy in support of this assertion.

Upon review of the parties' submissions, the Court is satisfied that Dauphin mistakenly

indicated to Coregis that it had received notice of Crawford's claims in 2002, rather than in March

2003, when the county received a courtesy copy of the complaint.  Even if the Court found otherwise,

there would remain an issue of disputed fact as to when exactly Dauphin County first had notice of

Crawford's claims that would preclude entry of summary judgment in Coregis' favor on this technical

point.  Accordingly, the Court rejects Coregis's first argument in favor of excluding coverage.

### B.   Dauphin's alleged awareness of facts, circumstances, or situations that might reasonably be expected to give rise to a claim against the county.

Coregis also contends that the facts and circumstances surrounding Crawford's petition for

post-conviction relief that came to light in late 2001 and early 2002 and that were known to members

10

of the Dauphin County District Attorney's office, constituted facts, circumstances, or situations that

Dauphin should have reasonably expected to give rise to a claim against the county.  Accordingly,

because Dauphin did not disclose Crawford's potential claims to Coregis in connection with the

county's application for insurance, Coregis argues that coverage for the claims is now barred.  In

response, Dauphin contends that the Dauphin County district attorneys who were aware of Crawford's

claims for post-conviction relief should not be considered officials or employees of the county for

purposes of reporting potential claims in connection with the county's insurance application.  Moreover,

Dauphin argues that the facts and circumstances of which county officials were aware were not such

that they could reasonably be expected to give rise to a claim against the county.  In order to evaluate

Coregis's argument, it is necessary to examine exactly what Dauphin County officials and employees

are said to have known prior to Coregis issuing the county the POL Policy.

On December 10, 2001, Crawford filed a petition for post-conviction relief, and in that petition

Crawford set forth allegations of conduct by law enforcement officers which are substantially similar to,

and formed the basis for, the Crawford action.  As a result of this petition, the discovery of Simpson's

briefcase, and the subsequent revelation of potential misconduct on the part of certain law enforcement

officers, the Dauphin County District Attorney offered to release Crawford on March 7, 2002.  As

Coregis notes, these events occurred prior to Coregis's issuance of the POL Policy.

Coregis also notes that the prosecution's expert witness in Crawford's criminal trials recanted

his testimony on December 6, 2001, and Janice Roadcap, the State Police Chemist, testified prior to

the POL Policy inception date that her report that was used to convict Crawford did not comport with

her original lab notes finding traces of blood in the valley of the lifted palm print.  Additionally, Coregis

11

demonstrates that the issues surrounding Crawford's claims and his eventual release was well-publicized in numerous local newspaper reports.  Accordingly, Coregis concludes that "[a]gainst this backdrop of activity it cannot be seriously contended that the insured reasonably expected coverage under its subsequently issued claims made and reported POL Policy."  (Doc. No. 146 at 13.)  Throughout its argument, Coregis emphasizes that Dauphin County officials' subjective belief as to the merit of Crawford's potential claims is irrelevant and that the focus should instead be on whether a reasonable person aware of the above facts would have objectively believed they could give rise to a claim against the county.

Whether an insured is aware of facts and circumstances that can reasonably be expected to give rise to a claim does not appear to have been squarely addressed by the Supreme Court of Pennsylvania, but the Third Circuit has considered the issue.  In Selko v. Home Insurance Company, 139 F.3d 146 (3d Cir. 1998), the Third Circuit found that an attorney who had used his client's money to finance his personal speculation in the real estate market had a basis to believe that he had breached a professional duty to his client prior to applying for malpractice insurance.  The Third Circuit held that when evaluating whether an insured had a reasonable basis to believe that it might be subject to a claim, a court must conduct a two-part analysis:

> First, it must be shown that the insured knew of certain facts.  Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a "basis to believe," it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty.

Selko, 139 F.3d at 152.  Accordingly, courts must engage in both a subjective and objective analysis to

determine whether an insured's claims for coverage are excluded on the basis of prior knowledge.

The Third Circuit subsequently applied the <u>Selko</u> test in another legal malpractice case in

<u>Coregis Insurance Co. v. Baratta & Fenerty, Ltd.</u>, 264 F.3d 302 (3d Cir. 2001).  In <u>Baratta</u>, an

attorney was sued for legal malpractice after allowing a medical malpractice claim to languish in the

state courts for more than ten years before it was dismissed for failure to prosecute.  <u>Id.</u> at 304.  The

Court of Common Pleas denied Baratta's petition to have his client's claim reinstated, and this decision

was upheld by the Pennsylvania Superior Court and by the Supreme Court of Pennsylvania.  <u>Id.</u>  Not

more than six days after the Supreme Court of Pennsylvania affirmed the lower courts' decision to deny

reinstatement, Baratta submitted an application for professional liability insurance to Coregis, which

subsequently extended coverage to Baratta.  <u>Id.</u>  Several months later, Baratta's client initiated a legal

malpractice action against Baratta and his firm, and Baratta notified Coregis of the claim.  <u>Id.</u>  Coregis

responded to Baratta, reminding him that an the malpractice policy contained a prior knowledge

exclusion.[4]  <u>Id.</u>  Soon after, Coregis denied coverage.  <u>Id.</u>  Thereafter, Coregis initiated a declaratory

judgment action against Baratta and his law firm, and the district court granted summary judgment in

favor of Coregis, concluding that "a reasonable attorney in the position of Baratta would foresee that his

lack of action in the Lees' medical malpractice case might be expected to be the basis of not only a tort

claim, but also a contract claim[.]"  <u>Id.</u> at 305 (quoting <u>Coregis Ins. Co. v. Baratta & Fenerty, Ltd.</u>, 57

---

[4]     That exclusions provided in relevant part that "[the] policy does not apply to . . . any
CLAIM arising out of any act, error, omission or PERSONAL INJURY occurring prior to the
effective date of this policy if any INSURED at the effective date knew or could have reasonably
foreseen that such act, error, omission or PERSONAL INJURY might be expected to the basis of a
CLAIM . . . ."  <u>Baratta</u>, 264 F.3d at 304.

F. Supp. 2d 179, 184 (E.D. Pa. 1999).  The Third Circuit affirmed, noting that Baratta was aware that

the state courts had dismissed the medical malpractice action for failure to prosecute, and that his clients

had advised him as to their dissatisfaction with his representation and disregard of their case.

Accordingly, the Court concluded that "a reasonable attorney in possession of these facts would have

realized that Baratta had breached a professional duty by failing to prosecute the Lees' case . . . and

that consequently there might be a basis for a claim."  Id. at 307.  In reaching this decision, the Court

stated that "breach of professional duty and a basis for a claim are . . . 'two peas in a pod.'  If the

former occurs, experience teaches that the latter can be expected to follow."  Id. at 307 n.3.

    Applying Selko and Baratta to the case at bar, the Court concludes that the prior knowledge

exclusion does not bar coverage for Crawford's claims against Dauphin County.  Initially, the Court

notes that both Selko and Baratta concerned claims for legal malpractice where the attorneys in each

case were subjectively aware of their own potential legal malpractice relating to their own breach of

professional duty, and the insurance policies they subsequently obtained provided specific coverage for

legal malpractice.  This is decidedly different from the instant case, where certain employees and county

officials may have been aware of Crawford's efforts to secure post-conviction relief and of the

investigation into potential wrongdoing by law enforcement officers during Crawford's criminal

prosecutions in the 1970s, and Dauphin's application for public officials liability insurance.  The Court

thus finds this case unlike the "two peas in a pod" the Third Circuit found in Baratta, because the Court

does not find that the facts and circumstances of which Dauphin County officials may have been aware

in 2001 and 2002 regarding alleged law enforcement malfeasance would have caused a reasonable

attorney to believe that Crawford would bring an action against the county itself.

14

The Court's finding in this regard is underscored by the claims Crawford ultimately brought against Dauphin County.  These allegations, set forth in paragraphs 67, 68, and 69 of the complaint are essentially that the county lacked safeguards, failed to train employees, and inadequately supervised its employees, thereby allowing the alleged misconduct of law enforcement officers involved in Crawford's prosecution.  As such, Crawford's claims against Dauphin County are a step removed from Crawford's allegations that certain law enforcement officers improperly altered evidence and gave false testimony in connection with his three trials for John Eddie Mitchell's murder, eventually resulting in the imposition of a life sentence and imprisonment for 28 years.  That certain Dauphin County officials were aware of Crawford's claims of police misconduct and evidence tampering would not necessarily cause a reasonable attorney to believe that the county faced a potential claim for negligence arising out of such allegations.

Moreover, the Crawford's petition for post-conviction relief, and his subsequent complaint, chiefly concerns the actions of three law enforcement officers, only one of whom may have potentially been employed by the county during periods relevant to Crawford's prosecution.  Janice Roadcap was a chemist with the Pennsylvania State Police and John Balshy was a corporal with the State Police. Crawford has alleged that Simpson was either a sergeant with the Harrisburg Police Department, or was a detective with Dauphin County.  It is not clear whether Simpson was, in fact, an employee of Dauphin County during any of the periods relevant to Crawford's prosecution.  The fact that Simpson's employment remains an issue of dispute causes it to be even less foreseeable that Dauphin County should have foreseen that Crawford was likely to bring a claim against the county relating to his prosecution.

15

For the foregoing reasons, the Court concludes that the prior knowledge exclusion in the POL

Policy does not bar Dauphin's claims for coverage under the policy.

>    **C.      The POL Policy exclusions invoked by Coregis do not bar coverage for**
>    **Crawford's claims against Dauphin County.**

As noted above, Coregis argues that coverage for the Crawford action is precluded by

Exclusions B, D, and F of the POL Policy.  In summary, these exclusions preclude coverage for the

following, regardless of the cause of action or theory alleged:

>    B.     any Claim or Loss Arising Out of any criminal, dishonest, malicious,
>    fraudulent or knowingly wrongful act or omission.

>    D.     any Claim or Loss Arising Out of death, bodily injury, sickness,
>    disease, disability, shock, humiliation, embarrassment, mental
>    injury, mental anguish, emotional distress, or injury to personal
>    or business reputation or character.

>    F.     any Claim or Loss Arising Out of assault, battery, false arrest,
>    detention, imprisonment, malicious prosecution or abuse of process.

For its part, Dauphin County argues that the foregoing exceptions are inapplicable because Crawford's

claims against it sound in negligence, and specifically concern allegations that the county lacked

safeguards, and failed to train and supervise its employees in order to prevent concealment, alteration of

testimony, and false testimony.  As such, Dauphin contends that these allegations are separate and

distinct from Crawford's allegations of intentional torts relating to alleged concealment and false

testimony.  In response, Coregis offers six arguments as to why it believes the exclusions operate to bar

coverage for Crawford's negligence claims against Dauphin.

First, relying on a case from the United States Court of Appeals for the Fifth Circuit and

another from the Southern District of Mississippi, Coregis contends that because Crawford's negligent

supervision claims are "related and interdependent" to the intentional tort allegations, there is no

coverage for the claims.  (Doc. No. 172, at 19.)  Second, Coregis argues that Crawford cannot

establish his claim for negligence against Dauphin County without first proving a claim for recovery

under 42 U.S.C. § 1983 for false arrest, imprisonment, malicious prosecution, or another intentional

tort.  Coregis claims that a "but for" test should be applied to determine whether the negligence claims

are "so intertwined with the intentional acts of the employee – and 'but for' those acts there would be

no claims asserted against the employer – then there is no coverage."  (Id.)  Third, Coregis posits that

because Dauphin may assert a defense of "superseding cause to negligence" – in that Simpson's alleged

acts were an independent and proximate cause of Crawford's injuries – coverage is excluded.  Fourth,

Coregis asserts that the only damages that may be assessed against Dauphin relate to negligent

supervision and training, and such a finding is predicated upon a finding that Simpson committed a

knowingly wrongful act that was outside the scope of his employment, and such intentional conduct is

excluded from coverage under the POL Policy.  Fifth, Coregis argues that the POL Policy expressly

does not apply to any claims or loss arising out of any of the torts set forth in Exclusions B, D, and F.

Therefore, even if Dauphin's alleged negligent training and supervision allowed Simpson's allegedly

intentional conduct to occur, Coregis argues that neither Simpson nor Dauphin are insured because the

negligence claims against Dauphin are nothing more than causes of action or legal theories for claims of

loss arising out of torts for which there is no coverage under the POL Policy.  Finally, Coregis asserts

that public policy should preclude Dauphin from collecting insurance benefits for a claim that the POL

Policy was not intended to protect.

Distilling these arguments to a common theme, it appears that the central thrust of Coregis's opposition is that the injuries Crawford has allegedly sustained were caused by intentional tortious conduct on the part of Walton Simpson (among others), who may or may not have been an employee of the county during the operative time period. As such, Coregis argues that it has no duty to defend or indemnify Dauphin County, regardless of the cause of action or theory alleged, because the single proximate cause of Crawford's injury was the intentional malfeasance of a rogue law enforcement officer, and that without such intentional malfeasance, there could be no claim against Dauphin County for negligence.

As Coregis points out, there have been cases within Pennsylvania holding that an insurer is not under a duty to defend or indemnify an insured where the tortious conduct alleged in the underlying complaint is intentional and the sole cause of the complainant's injury, and where the insurance policy at issue expressly excludes coverage for such actions. See Britamco Underwriters, Inc. v. Stokes, 881 F. Supp. 196 (E.D. Pa. 1995); Britamco Underwriters, Inc. v. Grzewkiewicz, 639 A.2d 1208 (Pa. Super. Ct. 1994). In Stokes, an insurer sought a declaratory judgment that it was not obligated to defend its insured, a pub, in an underlying action where a patron sued the pub for negligence after being assaulted by the pub's bouncer. The court, applying Pennsylvania law, concluded that an insurer was not obligated to defend the pub, finding that the insurance policy applied only to "accidents," and assault and battery was a decidedly intentional tort rather than an accident. Stokes, 881 F. Supp. 196, 200 Moreover, the court found that the policy specifically excluded causes of action for the pub's failure to hire, supervise, retain, or control any person, including its employees, and excluded causes of action against the pub for failing to prevent or halt assaults and batteries. Id..

18

In Grzewkiewicz, another case involving an assault and battery suffered by the patron of a pub, a patron alleged injuries resulting from an attack by another patron.  The pub sought coverage for the patron's personal injury claims under its multi-peril policy, and the insurer initiated a declaratory action, seeking judgment that it had no duty to defend or indemnify the pub in the underlying action.  The insurance policy at issue contained an assault and battery endorsement that provided:

> The Company [Britamco] is under no duty to defend or to indemnify
> an insured in any action . . . alleging such damages:
>
> Assault;
>
> Battery;
>
> Harmful or offensive contact between two or more persons;
>
> Regardless of degree of culpability or intent and without regard to
>
> . . .
>
> The alleged failure of the insured or his officers, employers, employees,
> agents or servants to attempt to prevent, bar or halt any such conduct.

639 A.2d at 1211 (emphasis added).  Because the court found that the underlying complaint alleged only intentional conduct, and the specific language of the exclusion covered the precise conduct at issue, including negligence in preventing assaults, the court found the policy excluded coverage for the conduct alleged in the underlying action.  Id.

In contrast to the decisions in Stokes and Grzeskiewicz, the Pennsylvania Superior Court reached a different conclusion in Board of Public Education v. National Fire Insurance Co. of Pittsburgh, 709 A.2d 910 (Pa. Super. Ct. 1998).  The underlying action that gave rise to Board of Public Education concerned allegations that a school district's negligence in hiring and supervision

19

allowed a member of a parent-teacher organization (PTO) to sexually molest a minor student.  709

A.2d at 911.  The school district's insurer disclaimed coverage and refused to defend the school

district, citing to the following language in the applicable insurance policy:

> This policy does not apply:
>
> to any claim involving allegations of . . .
>
> criminal acts . . .
>
> to any claims arising out of . . . (3) assault or battery . . .
>
> to any claim arising out of bodily injury to . . . any person[.]

Id. at 912.  After settling the underlying litigation, the school district brought suit against its insurer,

alleging, inter alia, bad fath and breach of contract.  Id.  The insurer, National Union, moved for

judgment on the pleadings as to the issues of coverage under the policy, and the trial court granted the

motion.  Id.

On appeal, the Pennsylvania Superior Court reversed.  The court first noted that it was not

considering whether National Union was "obliged to pay anything," but rather its inquiry was confined

to "whether the exclusionary language of the policy excused, as a matter of law, the otherwise manifest

obligation to defend."  Id. at 913.  Under the policy at issue, National Union was bound to provide

coverage for claims alleging "any Wrongful Act . . . of the Insured or any other person for whose

actions the Insured is legally responsible" and to "defend any action or suit brought against the Insured

alleging a Wrongful Act . . . ."  Id.  The policy defined "Wrongful Act" as "any actual or alleged breach

of duty, neglect, error . . . or omission committed solely in performance of duties for the School

District."  Id.

In the underlying action, the minor plaintiff alleged that the school board failed to screen persons they knew would have access to students and failed to implement procedures, policies, or background checks of those in contact with students to guard against sexual abuse of students.  Id.  Moreover, the complaint alleged that the school district failed to train, instruct, or inform its teachers, administrators, and staff not to permit contact between students and unscreened PTO volunteers.  Id.  The court found that these were allegations of "wrongful acts" under the policy, and the central question was whether the exclusions operated to bar coverage.  Id.

National Union argued that three exclusions precluded coverage.  First, National Union noted that the policy purported to exclude claims "involving . . . criminal acts."  Id. at 914.  The Pennsylvania Superior Court questioned how far such an exclusion could reasonably be interpreted:

> This language, at face value, would eliminate coverage for any factual scenario "involving" acts by any person which are arguably criminal; if the case peripherally "involved" someone jaywalking, the insurer could claim its duty to defend was eliminated.
>
> . . .
>
> [T]he insurer, to avail itself of this exclusion, would interpret the policy to mean "We will defend you against claims of your own negligence, and claims your negligence allowed others to cause injury negligently, but if by reason of that identical negligence any other person acts criminally, you're on your own."

Id.  The court rejected this sweeping interpretation of the exclusion, reasoning that the alleged criminal activity of a third party should not be allowed to control whether the insured was entitled to a defense against covered claims against itself.  Id.

Next, National Union argued that the policy excluded coverage for claims "arising out of . . . assault or battery," and therefore precluded coverage for plaintiff's claims of negligence against the school district because such claims allegedly arose out of the sexual assault.  Id. at 916.  The court disagreed with this interpretation, finding instead that the negligence pled against the school district allegedly allowed the assault and battery to occur, and therefore the negligence claims could not be found to arise out of the assault and battery:

> The injuries arise, according to the pleadings to which we are restricted, from the School District's negligent acts and omissions; the omissions and negligence (the "claim") did not arise from the molestation.  That is, Walls' acts "arose out of" the failings of the School District; not the other way around.  The complaint . . . challenged the improper tending of the garden from which the weeds of Walls' misconduct grew, but it is clearly the latter which arose from the former.  The weeds give proof of the bad gardening, but the claim, the ability to hold the gardener responsible, arises from the acts and omissions of the gardener, not the mere presence of weeds.

Id. at 915.  For similar reasons, the court rejected National Union's assertion that the policy's exclusion of coverage for claims "arising out of . . . bodily injury" operated to exclude coverage

for the negligence claims against the school district.  Id.[5]

Especially mindful that under Pennsylvania law an insurer's duty to defend is broader than its duty to indemnify, the Court finds the reasoning of Board of Public Education applies with equal force to the instant case, and therefore rejects Coregis's argument that Exclusions B, D, and F bar coverage for Crawford's negligence claims against Dauphin County.  Unlike in Stokes and Grzewkiewicz, where the applicable insurance policies expressly excluded claims that the insured was negligent in failing to prevent the underlying intentional torts, the POL Policy does not expressly exclude claims of negligence against Dauphin County, even where it is claimed that the county's negligence led to certain intentional torts that would otherwise be excluded.  Coregis argues that such an interpretation is mandated by the language of the Exclusions B, D, and F, which apply to any claims or loss relating to excluded acts, "regardless of the cause of action or theory alleged."  The Court disagrees with this interpretation of the POL Policy's exclusions.  Construing the policy against Coregis, the Court cannot read these exclusions to preclude claims of negligence against Dauphin County simply because another tortfeasor allegedly committed an otherwise excludable tort.

Additionally, a fair reading of the allegations of the Crawford complaint demonstrates that

---

[5]        Notably, one of the cases Coregis relies on in support of its argument that Crawford's claims of negligence against Dauphin County are not covered because they arose out of underlying intentional torts was found by the Pennsylvania Superior Court to be unpersuasive.  The court rejected part of the reasoning in Winnacunnet Cooperative School District v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, 84 F.3d 32 (1st Cir. 1996):  "we disagree with the Winnacunnet court's determination that the negligence arises from the subsequent crime.  Where it is alleged that negligence allowed a crime to occur, does the claim against the negligent arise from the negligence or from the criminality?  We believe it is the former."  Bd. of Pub. Ed., 709 A.2d at 917.  As discussed above, Crawford alleged that Dauphin County's failure to train and supervise its employees allowed them to alter evidence and testify falsely in his criminal prosecution.  (Crawford Compl. ¶¶ 67-69.)

Crawford is alleging systemic failure on the part of Dauphin County and the City of Harrisburg in

investigating and prosecuting Crawford, and that this systemic failure permitted and even fostered a law

enforcement culture in which evidence was tampered with and false testimony given, leading to injury.

The Court thus reads the allegations of the complaint as not limited exclusively to the actions of a few

rogue officials and employees, but more centrally to fundamental negligence of the municipalities

themselves.  Accordingly, the Court finds this case distinguishable from Stokes and Grzewkiewicz

(each of which concerned discreet injury arising out of alleged assault and battery), and more akin to

Board of Public Education, which concerned the broad negligence of an institution that allowed and

facilitated gross intentional misconduct.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Coregis's motion for summary judgment on the

POL Policy must be denied.  An appropriate order follows.

**V.**      **ORDER**

    **AND NOW**, this 9th  day of September 2005, for the reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT** Coregis's Motion for Summary Judgment on

POL Policy (Doc. No. 145) is **DENIED**.


                                        S/ Yvette Kane

                                        Yvette Kane

                                        United States District Judge